### ANDRITZ SPROUT–BAUER, INC., Plaintiff,

v.

### BEAZER EAST, INC., and Bridon–American Corp., Defendants.

#### No. 4:CV–95–1182.

United States District Court,
M.D. Pennsylvania.

July 17, 1998.

As Corrected July 22, 1998.

Steven P. Caley, James P. McCabe, Kelley Drye & Warren L.L.P., New York City, for Plaintiff.

Hershel J. Richman, Christopher M. Roe, Eli R. Brill, Dechert Price & Rhoads, Philadelphia, PA, for Defendant.

## MEMORANDUM

McCLURE, District Judge.

## BACKGROUND:

This action[1] arises out of efforts to recoup environmental contamination cleanup costs incurred in connection with a site owned by plaintiff Andritz Sprout–Bauer, Inc. (An-

dritz)[2] which is located in Muncy Borough and Muncy Creek Township, Lycoming County, Pennsylvania (the Muncy site). Andritz initially sought to recover cleanup costs incurred at the Muncy site from defendants Beazer East, Inc. (Beazer)[3] and Bridon–American Corp. (Bridon). All claims asserted against Beazer have been settled. Only the claims asserted against Bridon remain in the case.

## MUNCY, PENNSYLVANIA SITE

### Notice of violation issued

On or about March 29, 1989, the Pennsylvania Department of Environmental Resources (now known as the Pennsylvania Department of Environmental Protection or PaDEP) issued a "Notice of Violation" (NOV) for the Muncy site. PaDEP charged Andritz with violating Pennsylvania environmental law, and ordered it to perform cleanup operations at the site, including the removal and disposition of contaminated soil and restoration of groundwater quality.

The NOV listed violations observed at or near portions of the premises designated Building 70 and directed, *inter alia:* that operations be conducted "to remove and properly dispose of all contaminated soils and restore groundwater quality to background conditions if pollution is found" in the area of suspected contamination. (Second amended complaint, ¶¶ 20)

Issuance of the notice prompted an inspection for the presence of suspected contaminants.[4] In approximately March of 1990, contaminants above background levels were discovered in the vicinity of Building 70. This discovery prompted PaDEP to require further investigation to determine whether the contaminants found on-site had leached into the groundwater supply.

---

1. The cases filed to Civil Nos. 3:CV–95–1182 and 4:CV–96–0124 were consolidated. The action filed to 4:CV–96–0124 was filed in the United States District Court for the Eastern District of Virginia. In an order dated January 18, 1996 Judge James R. Spencer of the United States District Court for the District of Virginia transferred the action to this court pursuant to 28 U.S.C. § 1404(a).

2. We use the term Andritz here to refer to the corporation currently known as Andritz-Sprout

Bauer, Inc., as well as to any predecessor corporation whose interests and*or rights have been acquired by it.

3. Beazer was formerly known as Koppers Company, Inc.

4. Contaminants is used interchangeably with the statutory term "hazardous substances" throughout this memorandum.

In a memorandum issued on or about November 20, 1990, PaDEP directed, *inter alia*, that remediation activities be conducted in the vicinity of Building 70. Andritz began groundwater remediation and sampling activities in or about December, 1990 and off-site migration investigation activities in or about May, 1991. These activities continued through 1991 and 1992. (Second amended complaint, ¶¶ 20–22)

## Operations conducted and materials used at the Muncy site

The Muncy site consists of two non-contiguous parcels of land, designated Plants 1 and 2. Beazer owned Plant 1 from March 1, 1975 through August 4, 1986. Beazer acquired Plant 2 from Bridon in January, 1979. Beazer sold both plants to SWM Corp. on August 4, 1986. Andritz purchased the site on December 17, 1990. (Second amended complaint, ¶¶ 11–19)

During the period Bridon owned Plant 2 (January, 1975 to January, 1979), it operated a wire rope manufacturing operation at the site. Prior to Bridon's acquisition of Plant 2, it was owned by Jones & Laughlin, which also operated a wire rope manufacturing business at the Muncy site.

Andritz alleges that in connection with these operations, both Jones & Laughlin, and later, Bridon, owned and used underground storage tanks (USTs) adjacent to Buildings 201 and 204. It alleges that both corporations used chemical solvents and other classes of substances classified as "hazardous substances" under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601(14), and as hazardous and waste substances,[5] governed by Pennsylvania environmental statutes, in connection with the wire rope manufacturing operations. (Second amended complaint, ¶¶ 44–45)

Andritz alleges that Beazer and its predecessor-in-interest, Sprout, Waldron & Company, Inc. (Sprout, Waldron) used the Muncy site for various industrial and manufacturing operations including the production of equipment for grain, pulp and paper mills, fabrication of sheet metal and dies, foundry operations, and research activities, which caused hazardous substances to be deposited and left at the site, substances which Andritz is now being required to remediate. (Second amended complaint, ¶¶ 11–19)

Andritz alleges, upon information and belief, that Beazer used the Muncy site 1) to operate a die cell facility, located in Building 70; 2) to operate foundry operations located in Building 89; 3) to maintain used USTs adjacent to Buildings 74, 70, 81, 71, 66 and at Plant 2; 4) to maintain a drum storage area adjacent to Building 97 and Building 102; 5) to maintain one or more oil drip or collection pits adjacent to Building 70; and 6) to maintain waste accumulation piles at or adjacent to building 89, all of which were responsible for depositing wastes and hazardous substances at the site. The substances deposited by these activities and uses allegedly include: "acetone, chloroethane, 1,1–dichlorethane...toluene, 1,1,1–trichloroethane and xylene", as well as various petroleum hydrocarbons and*or mineral oils. (Second amended complaint, ¶ 35)

## Remediation and cleanup efforts and claims asserted

Andritz has submitted proposals for remediation measures to PaDEP to eliminate the hazards identified on-site. Cleanup efforts have begun and are still underway. (Second amended complaint, ¶¶ 23–25) Thus far, Andritz has incurred $6 million in investigation and cleanup costs. (Second amended complaint, ¶¶ 30–31).

In its second amended complaint, Andritz asserts claims under the following federal

---

**5.** The term "hazardous substance" is defined in both CERCLA, at 42 U.S.C. § 9601(14), and in PaHSCA, at Pa. Stat. Ann. tit. 35 § 6020.103. The PaHSCA definition incorporates, by reference, CERCLA's definition of the term. The PaHSCA defines a "hazardous substance" to include "[a]ny element, compound, or material which is...[d]efined or designated as a hazard-

ous substance pursuant to [CERCLA]." Pa. Stat. Ann. tit. 35 § 6020.103.

Both statutory definitions exclude "petroleum or petroleum products, including crude oil or any fraction thereof" and "natural gas." The disposal of those substances is governed by other state and federal environmental statutes.

and state laws to recover past and future costs incurred in connection with the Muncy site: 1) sections 107(a) and 113(f)(1) of CERCLA, 42 U.S.C. §§ 9607 and 9613 (Counts I and II, respectively); 2) section 7002(a)(1)(B) of the Resource Conservation and Recovery Act (RCRA) for injunctive relief, reimbursement and*or contribution, 42 U.S.C. § 6972(a)(1)(B) (Count III); 3) sections 9001–9003 of RCRA, 42 U.S.C. §§ 6991a, 6991b and 6991c, for alleged liability as continuing owners of USTs at the Muncy site last used on or before November 8, 1984 and, therefore, for statutory purposes, still owned by Beazer, and for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring Beazer "solely and entirely liable for all future costs necessary to respond to and abate the release and threatened release of substances from or occasioned by the USTs owned and operated by Beazer...at the Site that were discontinued from use prior to November 8, 1984.", (Count IV); 4) sections 507, 701 and 702, among others, of the Pennsylvania Hazardous Sites Cleanup Act (PaHSCA), Pa. Stat. Ann. tit. 35 §§ 6020.101–602.1305 (Count V); 5) section 1311, among others, of the Pennsylvania Storage Tank and Spill Prevention Act, (PaSTSPA), Pa. Stat. Ann. tit. 35 §§ 6021.101–6021.2104 (Count VI); 6) the Pennsylvania Clean Streams Law (PaCSL), Pa. Stat. Ann. tit. 35 §§ 691.1–691.1001 (Count VII); 7) a Pennsylvania common law claim for negligence *per se* based on the alleged violation of the PaCSL and PaSTSPA (Count VIII); 8) a claim in strict liability asserted under Pennsylvania common law based on the alleged storage of hazardous substances on Beazer property (Count IX); 9) a claim for contribution under the Pennsylvania Uniform Contribution Among Tort-feasors Act (PaUCTA), 42 Pa. Cons.Stat. Ann. §§ 8321–8327 (Count X); 10) a claim for contribution and indemnity (Count XI); 11) a claim for restitution (Count XII); and 12) a claim for declaratory judgment asserted under 28 U.S.C. §§ 2201 and 2202 on the grounds that Beazer, as the alleged "corporate" and "legal" successor in interest to Sprout, Waldron should be liable for "any and all responsibility of...[Sprout, Waldron] for all costs which plaintiff has incurred and may incur in responding to the release or threatened release of hazardous substances and other materials at, on or near the Site." (Count XIII).

There are before the court for disposition four motions for summary judgment: one by Andritz (record document no. 137) and three by Bridon (record document nos. 141, 143 and 145).

## Summary judgment standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)

> ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing...that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 323 and 325, 106 S.Ct. 2548.

Issues of fact are " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving par-

ty." *Childers v. Joseph*, 842 F.2d 689, 693–94 (3d Cir.1988), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir.1988).

## I. *Andritz' Motion for Partial Summary Judgment*

Plaintiff moves for summary judgment in its favor on: 1) Count I of the amended complaint which asserts a claim under CERCLA section 107, 42 U.S.C. § 9607; 2) Count II of the amended complaint, which asserts a claim for contribution for cleanup costs incurred at the Muncy site under CERCLA section 113, 42 U.S.C. § 9613; and 3) Count V of the amended complaint, which asserts a claim for cleanup costs under the Pennsylvania Hazardous Sites Cleanup Act (PaHSCA), Pa. Stat. Ann. tit. 35 §§ 6020.101–1305.

For the reasons which follow, the motion will be denied as to all counts on which judgment is sought.

### Count I

Count I of plaintiff's amended complaint asserts a claim under CERCLA section 107, 42 U.S.C. § 9607, for monetary damages sought as reimbursement for past and future cleanup costs. Andritz moves for summary judgment on Count I on the ground that there is no genuine issue of material fact with respect to any of the four elements necessary to establish liability on the part of Bridon under CERCLA section 107.

■ To establish liability under section 107 of CERCLA, a plaintiff must prove that: 1) a hazardous substance was disposed of at a "facility"; 2) there has been a "release" or a "threatened release" of a hazardous sub-

stance from the facility into the environment; 3) the release or threatened release has required or will require the expenditure of "response costs"; and 4) the defendant falls within one of four categories of responsible persons. 42 U.S.C. § 9607(a). See also: United *States v. CDMG Realty Co.*, 96 F.3d 706, 711–12 (3d Cir.1996). If these four requirements are met, liability attaches to the responsible party regardless of motive or intent. *Stearns & Foster Bedding v. Franklin Holding Corp.*, 947 F.Supp. 790 (D.N.J. 1996). See also: *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 259 (3d Cir.), *reh'g and reh'g in banc denied*, 964 F.2d 271 (3d Cir.1992) ("CERCLA imposes strict liability on responsible parties.") and *Gould, Inc. v. A & M Battery and Tire Service (Gould II)* 950 F.Supp. 653 (M.D.Pa.1997) (Conaboy, J.).

We disagree with Andritz' premise that all elements necessary for a finding of section 107 liability have been established. We find, on the basis of the record before us that: 1) it has not been established as a matter of law that Andritz has a right to recover under CERCLA section 107, since Third Circuit precedent precludes recovery under section 107 by "potentially responsible parties" (PRP's) and Andritz has not established as a matter of law that it is not a potentially responsible party; and 2) genuine issues of material fact preclude a finding that during its four-year term of ownership, Bridon deposited or otherwise left on the premises hazardous substances. With respect to Andritz' request for a declaratory judgment, we find that it is not entitled to a ruling declaring Bridon the successor corporation to the now defunct Jones and Laughlin Steel Company (J & L)[6] for purposes of CERCLA liability.

### Recovery under CERCLA section 107 unavailable to potentially responsible parties

■ Third Circuit precedent does not allow recovery under CERCLA section 107 by a party which is itself a potentially responsible party under CERCLA. *New Castle*

---

**6.** Subsequent to the conveyance of the Muncy plant to Bridon, J & L merged with Republic Steel Corporation to form LTV. Some time after the merger, in 1986, LTV filed a petition in bankruptcy.

*County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1119 (3d Cir.1997). Only an "innocent party" who has incurred cleanup costs may bring a section 107 action. "An action by a potentially responsible person is by necessity a section 113 action for contribution." Id. at 1120.

■ Several features distinguish a section 107 action from a section 113 action. Under section 107, liability is joint and several, and no equitable defenses apply. See: *Aluminum Company of America v. Beazer East, Inc.*, (*Alcoa/Beazer*) 124 F.3d 551, 562–63 (3d Cir.1997). Only the four defenses enumerated in section 107(b) can negate liability.

■ Under section 113, liability is several only, and the defendant can assert equitable grounds as a basis for diminishing or eliminating its alleged share of cleanup costs.[7] In apportioning cleanup costs, the court may consider such equitable factors as it deems relevant to the determination. Further, potential section 113 liability accrues only after a party has been compelled to pay more than its fair share of cleanup costs. *Stearns & Foster*, 947 F.Supp. at 798. Where both parties are "non-innocent" responsible persons, the courts have held overwhelmingly that any action to reapportion costs between the parties is an action for contribution, not an action for indemnification. *In re Tutu Wells Contamination Litigation*, 994 F.Supp. 638, 663 (D.V.I.1998).

"Innocent party" status is a rare phenomenon. As the United States District Court observed in *Stearns & Foster*, private parties who qualify to file a CERCLA section 107 action will be "few and far between." The only private parties who would clearly qualify for that status would be those who can legitimately claim one of the complete defenses to liability set forth in section 107(b) or someone with no legal responsibility for conditions on the property, such as, e.g., a neighboring landowner who acts out of concern that the

contamination will spread to his or her property. Few others can escape CERCLA's comprehensive strict liability scheme. *Id.* at 801.

Contrary to Andritz' assertions, it is not immediately clear that it can claim a right to proceed at all under section 107. Andritz can proceed on its section 107 claim only if it can claim "innocent party" status, that is, entitlement to full reimbursement from Bridon on the basis that it bears no responsibility for any hazardous substance currently found on that portion of the site formerly owned by Bridon.

It is not clear that Andritz is entirely blameless for the alleged presence of contaminants at the site. Bridon points to facts of record which support an inference that Andritz has contributed to the presence of hazardous substances at the site during its term of ownership. Among other evidence, Bridon offers the testimony of Stephen D. Webster on this point. Webster inspected the site on behalf of the PaDEP on several occasions. In describing violations which he found in or about March, 1989, Webster stated:

A. ...I had looked at the drum storage area and had mentioned that there was need of containment in the drum storage area. And I think that was mentioned again in this notice....

Yes, it was noted that the hazardous waste drum storage area did not meet requirements of a particular section, and I believe that I had noted that previously...

....

Q. And the purpose of those inspections generally was?

A. To verify compliance with the Solid Waste regulations.

Webster deposition at pp. 27–37 (exhibit 16). Webster's testimony leaves some doubt as to whether he found and documented sloppy

---

**7.** A person who can successfully establish a defense under section 107(b), 42 U.S.C. § 9607(b), is not a potentially responsible party. See: 42 U.S.C. § 9601(35) and *United States v. CDMG Realty Co.*, 96 F.3d 706, 721 (3d Cir.1996) (discussing "innocent owner defense").

Further, while a defendant in a section 107 action can only avoid joint and several liability

by demonstrating that the harm at a given site is divisible, parties to a section 113 action may allocate liability among potentially responsible persons based on equitable considerations. *In re Tutu Wells Contamination Litigation*, 994 F.Supp. 638, 662 (D.Vi.1998).

environmental containment practices by Andritz responsible or potentially responsible for the release of hazardous substances at the Muncy site. The excerpts from Webster's deposition referenced by Bridon discuss only findings relating to the handling of petroleum products, which are excluded from CERCLA coverage. For that reason, Webster's testimony alone is not persuasive in linking Andritz' handling of hazardous substances to the need for remedial measures.

Bridon also points to findings of culpability in the Notice of Violation issued by PaDEP in 1989 (Exhibit 17) and to similar findings in the report prepared by Compliance Services, Inc. (Compliance) in October, 1989 as the Compliance Audit Environmental Site Survey. Both reports refer to unsound environmental practices committed by Andritz which have or possibly have contributed to the presence of contaminants at Plant No. 2.

By way of example, the Environmental Site Survey prepared by Compliance describes conditions found at Building 202 in the Plate Room as follows:

EXTERNAL

Plate grinding is performed in both a wet and dry process in building 202. Aqueous coolant is used in the wet process and is recycled through a system located at the southern end of the building. Approximately 300 tons or 700 drums/year of solids are collected by a dragout line from the recycling operation. This material is currently stored outside the building along the southern fence. There is a stockpile of over 500 drums stored in a sloppy manner and spilling on to the dirt...Soil discoloration is evident...Delays in disposal of this material have been caused by lab analyses indicating the presence of Nickel in undesirable quantities. Nickel in the form of soluble salts poses a risk to groundwater.

(Compliance Site Survey, record document no. 230, exhibit 18 at p. 32).

In summarizing the findings, Compliance undercut, to some extent, the impression that Andritz' practices at Plant No. 2 contributed to the release of hazardous substances. Compliance stated:

Many of the chemicals used at the facility are not classified as hazardous materi-

als, i.e. cutting oils, lubricants, coolants, non-combustible machine and crankcase oils, commercial aqueous cleaning chemicals, etc.

(Compliance Site Survey, record document no. 230, exhibit 18 at p. 36).

Compliance did not, however, exonerate Andritz from practices consistent with CERCLA liability. It went on to state that:

Consumption and usage of hazardous materials is greatest in the foundry, where significant volumes of flammable resins and corrosive catalysts are used. These chemicals are supplied by bulk tanker, bulk cube-containers, drums, and 5 gallon pails. The foundry uses significant drum quantities of Acetone based adhesives, 1,1,1,-Tricholorethane, and Isopropanol.

....

1,1, 1–Trichloroethane appears to be the most commonly used cleaning and degreasing solvent in the facility. Drums of 1,1,1–TCA were identified in almost all of the buildings referenced in section 3.3.

....

Chemicals are stored in almost every building of the facility....

The absence of a central chemical product storage and distribution area is apparent. Management of chemicals in above ground and underground storage tanks...appears to be effective and straightforward throughout the facility. **The management of chemicals in cube containers, drums, and other containers is often haphazard.**

(Compliance Site Survey, record document no. 230, exhibit 18 at pp. 37–38) (Emphasis supplied.)

■ This and other evidence from which it can reasonably be inferred that Andritz is not an "entirely innocent party" precludes it from claiming at summary judgment stage eligibility under a section 107(b) absolute defense.

Even more compelling is Andritz' admission that the cleanup work it has undertaken has been done at the urging of PaDEP and under threat of legal action by state regulatory agencies. Other courts have found the

presence of governmental threats or compulsion a strong indicator that a plaintiff seeking section 107 status bears some culpability for the contamination, and, therefore cannot claim section 107 status, being relegated instead to a contribution action under section 113. See, e.g., *Transtech Industries, Inc. v. A & Z Septic Clean,* 798 F.Supp. 1079 (D.N.J.1992) (action undertaken under threat of government response is not voluntary, a factor in precluding the plaintiff from seeking recovery of the entire amount under CERCLA section 107), *appeal dismissed,* 5 F.3d 51 (3d Cir.1993), *cert. denied sub nom, Mayco Oil & Chemical Co. v. Transtech Indus.,* 512 U.S. 1213, 114 S.Ct. 2692, 129 L.Ed.2d 823 (1994).

Andritz does not dispute that it is acting under threat of compulsion by PaDEP. In describing its reasons for initiating cleanup efforts, it states:

> Because of . . . [the] NOV, Sprout–Bauer [Andritz] was required to, among other things, identify the extent of contamination in the area of the Muncy Facility and "perform clean-up activities to remove and properly dispose of all contaminated soils and restore groundwater quality to background conditions if pollution [was] found." . . . . **Had Sprout–Bauer not properly responded to this NOV, PADER indicated that it would have considered taking stringent enforcement actions against Sprout–Bauer.**

Record document no. 138 at p. 8. (Emphasis supplied.)

It is true that in many of the decisions which rule a section 107 claim unavailable to the plaintiff, cleanup efforts were instituted pursuant to a settlement agreement with a state or federal environmental agency. The fact that Andritz agreed to carry out the cleanup before legal action was filed and without the necessity of a formal settlement agreement does not change the fact that the cleanup was undertaken under threat of government compulsion. Compulsion, whether it comes about through formal settlement agreement or by mere threat of a lawsuit compelling a cleanup, is the key. That was the court's conclusion in *Gould I.* Summarizing the law on this issue, Judge Conaboy

stated: "[W]here a responsible party initiates a site cleanup pursuant to governmental pressure, and then sues another responsible party to allocate the costs, the action falls under the provisions of § 113." *Id.* at 913.

Even if Andritz' right to proceed as an "innocent party" under CERCLA section 107 were not at issue, other issues of material fact preclude a finding of liability against Bridon as a matter of law. Absent a finding that Bridon is responsible, as a successor corporation, for acts committed during the thirty-year tenure of J & L, an issue addressed below, liability attaches to Bridon as a former owner*operator only if there is evidence that it deposited hazardous substances on the site. While there is such evidence, it is not unrebutted. Bridon has asserted facts which controvert the evidence offered by Andritz to prove that it is responsible for the presence of hazardous substances on the site. Such evidence precludes summary judgment in favor of Andritz on Count I.

### Plaintiff's motion for judgment on Count II—CERCLA section 113 claim for contribution

Andritz argues that it is entitled to judgment in its favor as a matter of law on the contribution claim asserted under CERCLA section 113, 42 U.S.C. § 9613, in Count II of its amended complaint. Referencing CERCLA section 113, which provides: "Any person may seek contribution from any other person who is liable or potentially liable under [Section 107], during or following any civil action under . . . [Section 107(a) ]," Andritz argues that it is entitled to partial summary judgment on its claim, since Bridon is a "person" for CERCLA purposes. That may well be true, but Andritz' argument ignores the other criteria which are prerequisites for recovery under CERCLA section 113, and which have not been established as a matter of law.

■ To recover on a claim for contribution, the plaintiff must establish the same four elements as a section 107 plaintiff. That is, he must prove that 1) hazardous substances were disposed of at a "facility"; 2) there has been a "release" or "threatened release" of hazardous substances from the

facility into the environment; 3) the release or threatened release has required or will require the expenditure of "response costs"; and 4) the defendant falls within one of four categories of responsible parties. *In Re Tutu Wells Litigation*, 994 F.Supp. at 666, citing *United States v. CDMG Realty*, 96 F.3d 706, 712 (3d Cir.1996) and 42 U.S.C. § 9607(a). See also: *United States v. Alcan Aluminum Corp.*, (US/Alcan), 964 F.2d 252, 258–59 (3d Cir.1992).

Under CERCLA, four classes of persons may be held liable for contribution or response costs: 1) the current owner or operator of a facility, 42 U.S.C. § 9607(a)(1); 2) any person who owned or operated the facility "at the time of disposal" of a hazardous substance; 42 U.S.C. § 9607(a)(2); 3) any person who arranged for disposal or treatment, or arranged for transport for disposal or treatment of hazardous substances at the facility; and 42 U.S.C. § 9607(a)(3); and 4) any person who accepts or accepted hazardous substances for transport to sites selected by such person, 42 U.S.C. § 9607(a)(4). *CDMG Realty*, 96 F.3d at 713.

█ Andritz argues that Bridon falls within the second category, since it owned Plant No. 2 at a time when hazardous substances were disposed of at the site. In support of that theory, Andritz cites three or four principal pieces of evidence which it asserts prove that during its operation of the plant, Bridon employees disposed of hazardous substances at Plant No. 2. Bridon offers evidence refuting each of these alleged incidents and offers of proof. Bridon's assertions raise a genuine issue of material fact.

Andritz' motion for judgment on Count II will, therefore be denied.

### Motion for declaratory judgment of successor liability

Andritz moves for a judgment declaring Bridon the successor corporation to J & L and as such, liable under CERCLA for the environmental harm alleged caused by J & L's activities at the site. Andritz focuses its argument in favor of successor liability on J & L's unavailability. That is not, by itself, justification for shifting one-hundred percent of J & L's share of the cleanup costs to Bridon. The argument Andritz makes has been made before and endorsed by the courts in situations in which if the "orphan's share" of cleanup costs were not transferred to another corporation, they would be borne by the government, and ultimately by the taxpayers. In choosing between those two entities, the courts have generally favored shifting the burden to other corporations, finding that alternative more equitable than requiring the taxpayers to pay for corporate malfeasance or misfeasance. In such cases, the courts have ruled that public policy dictates that the culpable party pay, and that it, and not the taxpayers, bear the costs of cleanup.

In *Smith Land Improvement Corp. v. Celotex*, 851 F.2d 86, 92 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989), the Third Circuit elaborated on the reasons for adopting a general policy to that effect, tying them to congressional intent underlying passage of CERCLA. The court stated:

> Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost. Benefits from use of the pollutant as well as savings resulting from the failure to use non-hazardous disposal methods inured to the original corporation, its successors, and their respective stockholders and accrued only indirectly, if at all, to the general public.

*Id.* at 92.

The same considerations do not apply here. Here, the choice of who should suffer the loss stemming from the fact that J & L is not available to answer for costs allegedly stemming from its thirty-year operation of the Muncy site is between the current owner of the premises and the former owner, both of which are alleged to bear some responsibility for contaminants found at the site.

Here, the choice of who should bear the cost of answering for the actions of a now defunct corporation is not between the taxpayers and the business community, but rather between two corporations. For that reason, we are not persuaded that the same

burden-shifting rationale applied in conflicts between the government and a corporation should apply here.

■ In deciding which of two corporations should be made to shoulder the burden of answering for an unavailable corporate polluter, there is no compelling reason to shift that burden from Andritz to Bridon as a matter of course. While, as we discuss below, it may constitute grounds for shifting a portion of J & L's liability to Bridon, J & L's unavailability is not, in and of itself, grounds for shifting liability for its entire "orphan share" to Bridon.

### Successor liability of Bridon for acts of J & L

Andritz argues that through its acquisition of Plant 2 from J & L, Bridon became the successor corporation to J & L, rendering it liable for all removal and responses costs associated with hazardous substances deposited on the premises by J & L during its thirty-year term of ownership.

■ At common law, a purchaser of corporate assets is held liable for obligations or debts of the seller as a successor corporation only if one of the following four requirements is met: 1) the purchaser expressly or impliedly agreed to assume liabilities of the seller; 2) the purported sale of assets was, in fact, a "de facto merger" of the two companies; 3) the purchasing corporation is merely continuing the seller's business; or (4) the transaction is fraudulent and was structured for the purpose of evading legitimate debt or liabilities. *Gould II*, 950 F.Supp. at 656, citing *United States v. Mexico Feed and Seed Co., Inc.*, 980 F.2d 478, 487 (8th Cir.1992). CERCLA is silent on the question of successor liability, leading the courts to apply the common law rule of successor nonliability and four generally recognized exceptions to that rule. *Alcoa*Beazer*, 124 F.3d at 564.

None of the four exceptions applies here: There was no express or implied agreement by Bridon to assume the liabilities of J & L concurrent with the purchase of the Plant No. 2. The transaction was a straightforward sale of assets, not a "de facto merger" of the two companies. As discussed briefly above,

J & L continued to do business after the asset sale, and later merged with Republic Steel to form LTV.

■ Further, Bridon did not "merely continue" the business of J & L. " 'The traditional rule with regard to the "mere continuation" exception is that a corporation is not to be considered the continuation of a predecessor unless, after the transfer of assets, only one corporation remains, and there is an identity of stock, stockholders, and directors between the two corporations.' " *Gould II*, 950 F.Supp. at 656, citing *United States v. Carolina Transformer*, 978 F.2d 832, 838 (4th Cir.1992).

There is no evidence, and we do not understand Andritz to be asserting, that Bridon is a successor to J & L under the "mere continuation" doctrine. The two corporations did not share the same stockholders, nor did stock ownership overlap. See, e.g., *Gould II*, 950 F.Supp. at 656. Rather, there is substantial evidence that Bridon incorporated Plant No. 2 into its manufacturing operations and marketed the wire rope manufactured at Muncy under its (Bridon's) name and using its signature markings (consisting of a blue strand incorporated into the length of wire rope).

Finally, the record is devoid of evidence that the asset transfer was a subterfuge structured for the purpose of allowing J & L to avoid legitimate debts or obligations. Nothing before us suggests that the transaction was not conducted at arms-length or was for any purpose other than the obvious one of conveying manufacturing equipment from seller to buyer. J & L was, in fact, a competitor in the manufacture and sale of wire rope—making it extremely unlikely that the two would combine forces for purposes of helping J & L avoid legitimate obligations.

In conclusion, we find no colorable basis for any assertion that the 1975 sale of the Muncy plant to Bridon falls within any of the four traditional exceptions to non-liability on the part of the transferee corporation.

### Potential successor liability under Continuity of Enterprise Theory of Corporate Liability

Under CERCLA, standards for successor liability less rigorous than the traditional

common law standard have evolved. Looking to the remedial purpose of CERCLA, i.e. to place the burdens of cleaning up hazardous substances on those who caused the problem due to the irresponsible handling of such materials, the courts have lessened the stringent burden of establishing successor liability under the common law standard by expanding the scope of the "mere continuation" exception.

 Under this more expansive theory, christened the "continuing enterprise" theory, liability attaches under CERCLA to a purported purchaser which continues to operate the same business enterprise, essentially without interruption. Eight factors have been identified by the courts as indicating that the same enterprise continued under a different name or logo. They are:

1) retention of the same employees;

2) retention of the same supervisory personnel;

3) retention of the same production facilities in the same location;

4) retention of the same name;

5) production of the same product;

6) continuity of assets;

7) continuity of general business operations; and

8) whether the successor holds itself out as the continuation of the previous enterprise.

*Gould II,* 950 F.Supp. at 657.

Some courts have added another factor as a prerequisite for application of the continuing enterprise theory: knowledge of potential liability for environmental contamination. See, e.g., *Allied Corp. v. Acme Solvents Reclaiming, Inc.,* 812 F.Supp. 124, 129 (N.D.Ill. 1993). Most courts so finding have based that conclusion on their interpretation of the seminal decision on the continuing enterprise theory: *Mexico Feed and Seed,* 980 F.2d at 489–90.

In a carefully-reasoned analysis, Judge Conaboy of this district rejected that interpretation of *Mexico Feed and Seed.* After examining the decisions which followed *Mexico Feed and Seed* and added, or purportedly

added, a knowledge requirement to the list of relevant factors, Judge Conaboy concluded:

We disagree with these interpretations of *Mexico Feed and Seed.* Courts have repeatedly held that the purpose of applying the continuity of enterprise theory is to support the goals of CERCLA and to hold responsible parties liable, not to hold only those who knew of the potential problems liable. Furthermore, the purpose behind the continuity of enterprise theory is to uphold the goals of CERCLA, and "is justified by a showing that in substance, if not in form, the successor is a responsible party." . . .

We are of the opinion that the reason for such misinterpretations of the *Mexico Feed and Seed* decision is because in the majority of cases where the continuity of enterprise theory has been applied, the parties have been intertwined at some level or another. In such situations, it is easy to find that the parties knew of such liability because of the closeness among the corporations. If the factors of the continuity of enterprise theory are present, then, in substance, the corporation is continuing the business of its predecessor, for it is holding itself out to be the same corporation, and the end result is merely the same corporation wearing a new hat under the guise of the successor corporation.

*Gould II,* 950 F.Supp. at 659.

Judge Conaboy went on to state that knowledge, was not, however, irrelevant to the determination, just that it was not an absolute prerequisite to the imposition of liability for the acts of the predecessor owner. Judge Conaboy stated that:

The facts may, when taken in the totality of the circumstances, create the appearance of knowledge or notice, due to the factors of the continuity of enterprise theory. It is easy to infer notice or knowledge, in a case such as the one we consider here, when the successor holds itself out as the continuation of the previous enterprise by retaining the same employees, the same name, the same supervisory personnel, the same production facilities in the same location, produces the same product, maintains a continuity of assets and the general busi-

ness operations. But that does not mean that in its absence the successor will not be liable.

*Gould II,* 950 F.Supp. at 659. Emphasis supplied.

The Third Circuit has not yet endorsed the continuity of enterprise exception, nor has it ruled on what factors are relevant in applying that theory. We find persuasive, however, Judge Conaboy's analysis and his conclusions on the necessity of proving prior knowledge of potential environmental contamination.

 Applying the eight factors to the facts before us, we find no basis for granting Andritz the declaratory judgment it seeks on this issue. Contrary to Andritz' assertion that the " 'continuity of enterprise factors' overwhelmingly support" a finding that Bridon is a successor to J & L, we do not find that to be the case.

Some factors suggesting that Bridon continued the same enterprise are present. Bridon hired J & L's factory workers at Muncy. Bridon incorporated the Muncy plant into its manufacturing process, and so, in that sense, it continued to use the same production facilities at the same site as J & L to manufacture wire rope. Bridon used the facilities to produce the same product J & L had: wire rope.

However, we do not find these factors, by themselves, to be highly significant and certainly not outcome determinative. Almost any time one manufacturing concern sells production assets to another corporation, these factors will be present. The purpose of purchasing production facilities, obviously, is to use them to produce a product. The product will almost always be the same, in a generic sense, i.e. if the prior manufacturer used the machinery and equipment to make automobile seats, the buyer will, almost certainly use them for the same purpose—the purpose for which the machinery is designed. In the same way, if the purchaser is acquiring an entire plant, of course, manufacturing will continue at the same location. In such

cases, the purchaser will, in many instances, assume the obligations of the seller under applicable union contracts, and hire the laborers used by the former owner.[8]

Were we to find that these factors alone support a finding of successor liability under the enterprise theory, no sale of a plant or operating facility would ever be exempt from its application. Every buyer of a plant would be subject to liability for environmental contamination caused by the seller at that location. Virtually the only sales which would be exempt from the attachment of such liability would be the sale of one or several pieces of equipment transported to a different location by the buyer for use by different workers.

More compelling than the presence of these few characteristics suggesting the theory might be applied to Bridon's acquisition of the Muncy plant are a number of factors which support the opposite conclusion. According to the facts before us: Bridon did not hire J & L supervisory personnel, but rather brought in its own personnel to oversee wire rope manufacturing operations at the Muncy Plant and to integrate that production line into Bridon's overall operations. There is evidence that Bridon acquired the right to use and did use the J & L name, but it was used only in conjunction with the Bridon name. In deposing former Bridon employee William J. Golla, Andritz asked Golla whether he recalled the company using the following letterhead:

> Bridon–American Corp., J & L Wire Rope Division, Muncy, Pennsylvania.

Golla testified that he could not recall Bridon using this letterhead. (Record document no. 148). Even if it did, and we will assume that to be the case for purposes of deciding the motion before us, we do not find that greatly significant. Bridon's name heads the caption. As Bridon points out, and Andritz does not dispute, J & L continued to manufacture and sell products after the sale of the Muncy assets. Given that fact, it is apparent that Bridon was not holding itself out as the successor to J & L, but was merely referenc-

---

**8.** Hiring the workers of the seller is not, in any event, a practice public policy would discourage. Obviously, the practice promotes economic stability in addition to eliminating undue upheaval

in the lives of hourly-wage workers who have no say in the sale or acquisition of the plant which employs them.

ing the wire rope production facilities it acquired from J & L as part of its overall operations. That is different than holding itself out as J & L or as selling wire rope identified as a product of Jones & Laughlin. We cannot find as a matter of law, based on the evidence before us, that either occurred.

Manufacturing operations at the Muncy Plant did, by the accounts before us, continue uninterrupted after the Bridon acquisition. But again, the operations continued under the supervision of Bridon managers, production techniques and practices were modified to bring them into line with Bridon practices, and steps were taken, e.g. the incorporation of Bridon's trademark blue strand, to identify the wire rope as a product of Bridon.

We find no evidence that Bridon held itself out as J & L. As stated above, J & L continued operations after the transfer of assets. *Gould II*, 950 F.Supp. at 657. Bridon's reference in its letterhead does not compel a different conclusion. As we have already stated, the reference to J & L is secondary to a reference to Bridon–American which leads off the caption, and again the reference is to a J & L Wire Rope Division of Bridon–American.

For all of these reasons, Andritz' motion for a judgment declaring Bridon the successor corporation to J & L for purposes of assigning CERCLA liability will be denied.

### Count V—PaHSCA Claim

Andritz seeks judgment in its favor on Count V of its amended complaint. Count V asserts a claim for recovery of response costs under the Pennsylvania Hazardous Sites Cleanup Act, (PaHSCA) Pa. Stat. Ann. tit. 35 §§ 6020.101—6020.1305 *et seq.*

■ PaHSCA authorizes a private right of action. *Bethlehem Iron Works, Inc. v. Lewis Industries, Inc.*, 891 F.Supp. 221 (E.D.Pa.1995). Section 701(a) of PaHSCA, Pa. Stat. Ann. tit. 35 § 1620.701(a), lists the four elements necessary to establish a claim for response costs. There must be evidence of:

1) A release or threatened release,

2) of a hazardous substance,

3) from a site, and

4) there must be a responsible person as defined in subsection 701(a) of PaHSCA; that is, a person who "owns or operates" a site as defined in PaHSCA subsection 701(a)(1). *Commonwealth of Pennsylvania v. Bryner*, 149 Pa.Cmwlth. 59, 613 A.2d 43, 45 (1992).

PaHSCA defines an "owner or operator", in pertinent part, as "[a] person who owns or operates or has owned or operated a site, or otherwise controlled activities at a site." Pa. Stat. Ann. tit. 35 § 6020.103. PaHSCA section 701(a)(i) imposes liability on a person who owns or operates the site at a time when a hazardous substance is either "placed or comes to be located in or on the site." Pa. Stat. Ann. tit. 35 § 6020.701(a)(i).

Section 6020.701(a) of PaHSCA imposes liability upon three types of persons: site owners or operators, generators of the hazardous substances, and transporters of the hazardous substances. Section 6020.701(a) provides, in relevant part:

[A] person shall be responsible for a release or threatened release of a hazardous substance from a site when any of the following apply:

1) The person owns or operates the site:

 i) when a hazardous substance is placed or comes to be located in or on a site;

 ii) when a hazardous substance is located in or on the site, but before it is released; or

 iii) during the time of the release or threatened release.

As under CERCLA, the term "person" is defined under PaHSCA to include "an individual" as well as a "firm, corporation, association, partnership, consortium, joint venture, [or] commercial entity ...." Pa. Stat. Ann. tit. 35 § 6020.103.

PaHSCA and CERCLA resemble each other in some respects, but there are also material differences. PaHSCA differs from CERCLA in that it recognizes a category of potentially responsible parties excluded under CERCLA. As we stated above, liability attaches under CERCLA to a former owner or operator only if there is evidence that

disposal of hazardous substances occurred during that person's tenure of ownership. Potential liability under the PaHSCA is broader. PaHSCA imposes liability on intervening landowners. That is, any person in the chain of title is subject to liability even in the absence of evidence that it contributed to the current environmental problem. Under PaHSCA, any person found to be a "responsible person" is "strictly liable" for response costs and damages "which result from the release or threatened release or to which the release or threatened release significantly contributes." Pa. Stat. Ann. tit. 35, § 6020.702.

Although, as under CERCLA, strict liability applies to the listed categories of potentially responsible parties, like under CERCLA, there are statutory exceptions to liability. PaHSCA section 701(b) lists numerous exceptions to liability, one or more of which Bridon may be able to prove at trial.

▆▆▆ As we have already discussed, Bridon is not liable as a matter of law as a successor corporation to J & L. Nor can we find as a matter of law that Bridon disposed of hazardous substances during its term of ownership. Under the circumstances, it is equally impossible for this court to conclude, on the basis of the record before us, that no defense available under PaHSCA section 107(b) applies to Bridon.

We will, for all of these reasons, deny the motion for summary judgment as to Count V.

## II. *Bridon's motion for summary judgment as to costs related to a soil vapor extraction system.*

Defendant Bridon has filed a motion for a judgment declaring it not liable for costs incurred by Andritz in connection with the soil vapor extraction remedy applied to the soil at Plant No. 2. Bridon moves for a ruling that it bears no liability for costs incurred by Andritz in the investigation, design, and implementation of a soil vapor extraction system intended to remediate petroleum contamination in a limited area of Plant No. 2.

For the reasons which follow, the motion will be granted to the extent of the relief provided in the accompanying order.

## Contamination leading to implementation of soil vapor extraction system at Plant No. 2

Andritz alleges that the following findings and conditions led to implementation of the soil vapor extraction system (SVE) at Plant No. 2: In or about 1990, petroleum hydrocarbons were detected at a depth of 15 to 16 feet below ground level in a yard near Buildings 200, 201 and 205. Two 500–gallon underground storage tanks (UST's) had formerly been located in the area. One of the tanks was allegedly used by Bridon and other former owner*operators of the Muncy site to store naphtha, a cleaning solvent.

The former naphtha tank was removed in April, 1986 while Plant No. 2 was owned by Beazer. No apparent signs of leakage were noted at that time. The second UST identified as a possible or probable source of the ETX contamination noted by ENSAFE was allegedly used to store gasoline. That tank was removed by Andritz in 1989. Its condition at the time of removal was not well documented.

Soil samples taken from the areas where the UST's were formerly located tested positive for total petroleum hydrocarbons (TPH) and volatile organic compounds (VOC's) found in petroleum products, such as ethyl benzene, toluene, and xylene (ETX compounds). Testing data suggested that the contaminants were spread over an area approximately 135 feet by 50 feet.

Through its environmental consultants, Andritz designed and implemented a soil vapor extraction system (SVE system) to eliminate the contamination. Due to unexpectedly high groundwater levels, the system never operated in a fully successful fashion, and it was discontinued in December, 1994. The cost of designing and implementing that system comprises a substantial portion of the response costs Andritz seeks to recover from Bridon.

Andritz asserts a right to recover the cost of the SVE system under several different claims asserted under federal and state stat-

utory law and under common law. Bridon seeks judgment in its favor on the issue of cost recovery for the SVE system on the claims asserted by Andritz under: 1) CERCLA; 2) PaHSCA; 3) state common law for negligence per se and strict liability, restitution and indemnification; 4) the PaCSL; and 5) the PaUCTA.

· For the reasons which follow, we find that Andritz has no right to recover the SVE response costs under any of the theories of liability challenged by Bridon. Judgment will, therefore, be entered in favor of Bridon and against Andritz on all claims for recovery of costs associated with the design and implementation of the SVE system.

### Recovery under CERCLA and PaHSCA for SVE system precluded under petroleum exclusion

To recover under the PaHSCA, a plaintiff must establish the following four elements:

1) A release or threatened release,

2) of a hazardous substance,

3) from a site,

4) by a responsible person as defined in subsection 701(a) of PaHSCA; that is, a person who "owns or operates" a site as defined in PaHSCA section 103. 35 Pa. Stat. Ann. tit. 35 § 6020.103. See also: *Commonwealth, Dept. of Environmental Resources v. Bryner,* 149 Pa.Cmwlth. 59, 613 A.2d 43, 45 (1992) and *Bethlehem Iron Works, Inc. v. Lewis Industries, Inc.,* 891 F.Supp. 221 (E.D.Pa. 199 and Pa. Stat. Ann. tit. 35 § 6020.701(a)(1). PaHSCA defines an "owner or operator", in pertinent part, as "[a] person who owns or operates or has owned or operated a site, or otherwise controlled activities at a site." Pa. Stat. Ann. tit. 35 § 6020.103.

■ Andritz is precluded from recovering costs incurred in connection with the SVE system under either CERCLA or the PaHSCA. Both statutes exclude from their coverage contamination resulting from the discharge or release of petroleum or petroleum products.

■ CERCLA excludes "petroleum or petroleum products, including crude oil or any fraction thereof" and "natural gas", 42

U.S.C. § 9601(14), from its definition of "hazardous substance." PaHSCA incorporates the CERCLA definition of a "hazardous substance." Pa. Stat. Ann. tit. 35 § 6020.103. Thus, neither statute serves as a mechanism for addressing contamination resulting from petroleum and petroleum products. There are other avenues for addressing such contamination. See, e.g., PaSTSPA, Pa. Stat. Ann. tit. 35 § 6021.103 (Term "regulated substance" is defined to include "petroleum, including crude oil or any fraction thereof, and hydrocarbons...liquid at standard conditions of temperature and pressure...including, but not limited to, oil, petroleum, fuel oil, oil sludge, oil refuse, oil mixed with other non-hazardous wastes and crude oils, gasoline and kerosene."). Thus, costs incurred in the cleanup of petroleum or petroleum products-related contamination cannot be obtained under either CERCLA or the PaHSCA. *Bethlehem Iron Works, Inc. v. Lewis Industries, Inc.,* 1996 WL 557592 at * 47 (E.D.Pa. October 1, 1996).

Andritz does not challenge the petroleum exclusion, but argues that it is not applicable here, since the chemical compounds found in the former UST area, although found in petroleum, are also found in other substances which are covered under CERCLA and PaHSCA. Andritz argues that the ETX compounds detected are also found in cleaning solvents and other substances which Bridon may have used as solvents or for other purposes in the manufacture of wire rope.

The difficulty with this argument is twofold: 1) It is speculative—Andritz speculates that the contamination may have resulted from the presence or breakdown of various cleaning solvents, but there appear to be no facts which support that theory; and 2) the facts of record suggest that the contamination detected 15 to 16 feet below the surface in the former UST area originated with the UST's——there being no other obvious source of contamination and no other plausible theory which would explain finding the contamination at that depth, but not at the surface level.

As we stated above, two 500–gallon UST's formerly located near Buildings 200, 201 and 205 have been identified by Andritz as possi-

ble sources of the contamination the SVE was designed to remove. There is no evidence cited to the court that during the four years Bridon owned the property either tank ever contained anything other than gasoline, naphtha, or kerosene.

■ All three substances are products of petroleum. Gasoline is unquestionably a petroleum product excluded from CERCLA and PaHSCA coverage. Naphtha is "a colorless, volatile petroleum distillate, usually an intermediate product between gasoline and benzine, used as a solvent, fuel, etc." *Random House Dictionary of the English Language,* (2d ed.1987) at p. 1277. Naphtha is not a substance covered by CERCLA or PaHSCA, since it is a product of petroleum. See: *Wilshire Westwood Assocs. v. Atlantic Richfield Corp.,* 881 F.2d 801 (9th Cir.1989) and *United States v. Atlas Minerals & Chemicals, Inc.,* 1995 WL 510304 at * 92–93 (E.D.Pa. Aug. 22, 1995) (naphtha and other substances are petroleum fractions).

■ One of the tanks may have contained kerosene at one time. Kerosene is also excluded as a petroleum product. Kerosene is "a mixture of liquid hydrocarbons obtained by distilling petroleum, bituminous shale, or the like, and widely used as a fuel, cleaning solvent, etc." *Random House Dictionary of the English Language,* (2d ed.1987) at p. 1051.

The chemical compounds detected by Andritz' environmental consultants in the former UST area: ethyl benzene, toluene and xylene (ETX compounds) are the volatile organic compounds found if gasoline is present or when gasoline and other petroleum products begin to break down.

In addition, the physical evidence points to the UST's as the source of the sub-surface contamination the SVE was implemented to redress. The evidence that Andritz offers to support an inference that the contamination originated in what has become known as a "sump hole" or unlined pit used by Bridon as a dumping ground for hazardous waste does not go beyond speculation. The facts Andritz offers in support of this theory of origin are drawn from the testimony of a former Bridon (and now Andritz) employee.

Bridon systematically refutes each element of evidence Andritz offers to support its assertion that Bridon discarded solvents by placing them in an unlined sump hole and that the leachate from that sump hole is responsible for the ETX contamination detected by ENSAFE.

Thus, the only inference that can reasonably be drawn from the physical evidence is that the ETX compounds originated in some way from the two 500–gallon UST's removed by Beazer and Andritz in the 1980's and was caused either by leakage or by perhaps by spillage when the tanks were filled.

Equally persuasive are the references in the filings Andritz made with the PaDEP and in other documents. Until recently, Andritz consistently referred to the contamination the SVE was designed to redress as petroleum-related. In filings with the PaDEP which describe the purpose of the SVE system, Andritz consistently characterizes the problem as contamination from gasoline and petroleum products. Not until recently did Andritz begin characterizing the contamination as originating from other sources.

For all of these reasons, we conclude that: 1) the only inference which can reasonably be drawn on the basis of the record before us is that the contamination the SVE was designed to extract from the soil originated from the discharge or release of petroleum products, and is, therefore, excluded from coverage under either CERCLA or the PaHSCA.

**Lack of evidence that substances classified as hazardous under CERCLA or the PaHSCA were deposited in close proximity to the former UST area by Bridon**

Andritz argues that, aside from possible leakage or spillage associated with the UST's used to store gasoline, naphtha and kerosene, there is evidence that Bridon maintained what has been referred to as a sump hole on the premises, and that leachate from that sump hole was responsible for the contamination the SVE was designed to eradicate.

The evidence of record does not support Andritz' theory. Andritz offers the following in support of its theory: 1) an affidavit from

a former employee of Bridon and J & L stating that waste naphtha and muriatic acid (hydrochloric acid) were deposited in an unlined pit during Bridon's operation of the plant; 2) argument that the ETX compounds detected by its consultants could have resulted from the presence or breakdown of substances other than petroleum derivatives; and 3) evidence confirming the presence of chlorinated solvents TCA and PCE near the former sump hole location.

None of these supports the theory that the SVE was designed and implemented to redress non-petroleum-related contamination. Addressing the items seriatim, the SVE system was designed and implemented in 1992, long before the first documented reference, in 1996, to an alleged release of naphtha or muriatic acid from the sump hole area. The area where the alleged sump hole was located is beyond the coverage area of the SVE system, further proof that the presence of naphtha or muriatic acid emanating from the alleged sump hole was not a factor in the decision to design and implement the SVE system.

There is no evidence of "spent solvents" or "paint wastes" as sources of contamination the SVE system was designed to eradicate. Among other factors, the location of the contamination that prompted implementation of the SVE makes that unlikely. As we discussed above, the zone of contamination was 15 to 16 feet below the surface. Contamination was not found at the surface during that round of testing. The location is not consistent with the theory that the ETX compounds found at the former UST location are traceable to muriatic acid and other chemicals allegedly dumped in a surface sump hole. On the other hand, the location is consistent with the theory that the ETX compounds originated from substances which leaked from one of the two UST's initially identified by ENSAFE and by Andritz as possible sources of the contamination.

Judgment will, therefore, be entered against Andritz and in favor of Bridon on the CERCLA and PaHSCA claims asserted in Counts I, II and V for costs incurred in designing, implementing or otherwise in association with the SVE system.

## Count III RCRA Claims

Count III of plaintiff's amended complaint asserted a claim under RCRA, 42 U.S.C. § 6972(a)(1)(B) for monetary damages sought as reimbursement for past and future cleanup costs. For the reasons stated in our prior memorandum dated May 1, 1997 which addressed, *inter alia*, Beazer's Rule 12(b)(6) motion to dismiss the Count IV RCRA claim asserted against it, judgment will be entered in favor of Bridon and against Andritz on the RCRA claim for monetary damages asserted in Count III.[9]

As stated in our prior memorandum, to the extent that Andritz seeks to recover expenses incurred in cleanup efforts, its claim is barred by the United States Supreme Court's decision in *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). Count III remains in the case only to the extent Andritz asserts a claim for injunctive relief against Bridon.

## Pennsylvania Clean Streams Law

Count VII of Andritz' second amended complaint asserts a claim for cleanup costs under the Pennsylvania Clean Streams Law (PaCSL). We concluded in our prior memorandum dated May 1, 1997 that there is a private right of action under the PaCSL for monetary damages.

Bridon argues that in so ruling, this court misinterpreted the holding in *Circuit City Stores, Inc. v. Citgo Petroleum Corp.*, 1995 WL 393721 at *3 (E.D.Pa. June 29, 1995). We have to agree. Closer analysis of the case and of excerpts from the pleadings reveal that what was sought in *Circuit City* and what the court, in fact, allowed, was an award of costs, not an award of monetary damages.

What we then construed as *Circuit City's* endorsement of a private cause of action under the PaCSL was one of two principal

---

**9.** The viability of Andritz' Count III RCRA monetary damage claim asserted against Bridon was not before this court on a Rule 12(b)(6) motion.

Bridon filed an answer to the second amended complaint.

reasons for our prior holding. The other was the Pennsylvania appellate courts' decision in *Centolanza v. Lehigh Valley Dairies, Inc.*, 430 Pa.Super. 463, 635 A.2d 143 (1993) (*Centolanza I*), aff'd, 540 Pa. 398, 658 A.2d 336 (1995) (*Centolanza II*).

In *Centolanza II*, the Pennsylvania Supreme Court held that a private cause of action may be brought under the PaSTSPA to collect costs for cleanup and diminution in property value. Pa. Stat. Ann. tit. 35 § 6021.1305(c). Framing the issues before it, the Pennsylvania Supreme Court stated:

> This case concerns whether private citizens may obtain an order under the Pennsylvania Storage Tank and Spill Prevention Act (STSPA) ... [Footnote omitted.] ... directing storage tank owners to make payments to them for anticipated oil contamination cleanup costs and diminution in the value of property, and whether private citizens are entitled to use the statutory presumptions provided in the STSPA. Because we find that a private citizen may avail himself of the remedies conferred on the Department of Environmental Resources, payments for anticipated costs and property value diminution are available. Additionally, private citizens may take advantage of the statutory presumptions set out in the STSPA.

*Centolanza II*, 658 A.2d at 337. We found that the Pennsylvania Supreme Court's holding in *Centolanza II* on the right to bring a private cause of action under the PaSTSPA strongly suggested that the court would reach the same conclusion in construing the PaCSL.

We are no longer persuaded that such is the case. After contrasting the language and statutory enforcement framework of the PaSTSPA with that of the PaCSL, we no longer hold the same view. As the Pennsylvania Superior Court pointed out in *Centolanza I*, the PaCSL "provides for a private action against DER, but does not mention an action against the alleged violator(s). We find, therefore, the CSL to be clearly distinguishable from our present case and would not find that it controls our case even had we found the STSPA language to be ambiguous." *Centolanza I*, 635 A.2d at 148 n. 3.

On the strength of these distinctions, we find that the Pennsylvania Supreme Court's recognition of a private cause of action in *Centolanza II* is not necessarily indicative of its intent to recognize a like cause of action under the PaCSL if the issue were to come before it.

■ Having reconsidered both underpinnings of our prior ruling that the Pennsylvania courts would allow a private cause of action under the PaCSL, we now reach a different conclusion. We now hold, as have other federal courts, that there is no private cause of action for monetary damages under the PaCSL. Private citizens may bring an action to compel compliance if PaDEP does not do so, but they may not bring a private action to recover cleanup costs.

We will, on that basis, enter judgment in favor of Bridon and against Andritz on Count VII on the ground that there is no private cause of action for monetary damages under the PaCSL.

### Negligence per se claim grounded in PaCSL

Our conclusion that the PaCSL does not allow a private cause of action for monetary damages undermines as well Andritz' right to recover on a theory of negligence *per se*. The PaCSL is the only statute upon which Andritz bases its negligence *per se* claim.

Negligence *per se* has been defined as:

> Conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances, either because it is in violation of a statute or valid municipal ordinance, or because it is so palpably opposed to the dictates of common prudence that it can be said without hesitation or doubt that no careful person would have been guilty of it. As a general rule, the violation of a public duty, enjoined by law for the protection of person or property, so constitutes.

*Black's Law Dictionary*, 6th Ed, 1990.

Section 286 of the *Restatement (Second) of Torts*, outlines the criteria for allowing a negligence *per se* claim; It provides:

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

*Restatement (Second) of Torts,* § 286 (1965).

*Restatement (Second) of Torts,* § 288 defines the circumstances under which a negligence *per se* action will not be adopted. It provides:

The court will not adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively

(a) to protect the interests of the state or any subdivision of it as such, or

(b) to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public, or

(c) to impose upon the actor the performance of a service which the state or any subdivision of it undertakes to give the public, or

(d) to protect a class of persons other than the one whose interests are invaded, or

(e) to protect another interest than the one invaded, or

(f) to protect against other harm than that which has resulted, or

(g) to protect against any other hazards than that from which the harm has resulted.

*Restatement (Second) of Torts,* § 288 (1965).

The question of whether the PaCSL does or does not support a claim of negligence *per se* claim was addressed by Judge Nealon in

*Lutz v. Chromatex, Inc.,* 718 F.Supp. 413, 428 (M.D.Pa.1989). Judge Nealon stated:

The issue of whether a plaintiff can assert a cause of action based on negligence *per se* is closely related to the question of whether a private cause of action exists under a statute. As stated by the Third Circuit Court of Appeals,

[m]ost formulations of the standards for implying a private cause of action center on the presence or absence of a legislative intent to impose civil liability. In theory, at least, application of the negligence *per se* doctrine represents a judicial policy judgment independent of legislative intent with respect to the imposition of civil liability. Both, however, address the question of whether the policy behind the legislative enactment will be appropriately served by using it to impose and measure civil damage liability.

*Id.* at 428, citing *Frederick L. v. Thomas,* 578 F.2d 513, 517 n. 8 (3d Cir.1978) and Prosser and Keeton, *Torts* § 36 (5th ed.1984). Discussing the availability of a negligence *per se* action under the PaCSL, Judge Nealon noted in *Lutz,* that the Pennsylvania legislature obviously

intended to limit a private citizen's right to enforce the terms of the Act by vesting enforcement authority in the DER. At the same time, however, the General Assembly expressly provided that nothing contained in the Acts 'shall in any way abridge or alter rights of action or remedies now or hereafter existing in equity, or under the common law or statutory law, criminal or civil . . . .'

*Id.,* citing Pa. Stat. Ann. tit. 35 §§ 6018.607 and 691.701. See also: *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. at 1150 n. 30 and *Fleck v. Timmons,* 374 Pa.Super. 417, 543 A.2d 148, 152 (1988).

Judge Nealon continued:

"Thus, the legislature obviously had the rights of private citizens in mind when it drafted the Acts but elected to protect those rights by way of existing common law remedies, such as actions for negligence and nuisance. Far from acting out of deference and respect to the legislature,

see Prosser and Keeton, *supra*, the court would be going against the expressed intentions of the legislature by permitting plaintiffs' negligence *per se* claim to proceed."

*Id.*

Comparison of the PaCSL with the PaSTSPA strengthens the conviction that although the latter can be the basis of a negligence *per se* claim, the former cannot. In *Centolanza I*, the Pennsylvania Superior Court concluded that an alleged violation of the PaSTSPA can be the basis for a negligence *per se* action, looking to language in the statute indicative of the legislature's intent to allow private citizens to recover for alleged violations. The Superior Court stated:

> We find that because private actions are authorized under the act, the STSPA contemplated the protection of the individual, as well as the public at large. The statute declares that storage tank releases are a threat to public health and safety. 35 P.S. § 6021.102(b). In addition to permitting the Commonwealth to commence suit to abate the public nuisance created by a violation, the legislature recognized the need to protect individuals harmed by the releases and, therefore, provided for their private actions .... [Footnote omitted.]

**Because the STSPA differs from the CSL and SWMA, as we have discussed previously, cases interpreting those other acts are not binding on our determination.** The legislature clearly intended to treat storage tank releases in a different manner than the harms caused by these other acts. We find that *Restatement (Second) of Torts* § 286 applies in these circumstances, and, therefore, find that a violation of the STSPA can serve as evidence in a claim of negligence per se.

*Id.*

■■■ Thus, it is clear that the PaCSL does not support a negligence *per se* claim. Judgment will, therefore, be entered in favor of Bridon and against Andritz on the negligence *per se* claim asserted in Count VII.

### Tort claims subject to Pennsylvania two-year statute of limitations

Bridon argues that all tort claims subject to Pennsylvania's two-year statute of limitations, 42 Pa. Cons.Stat. Ann. § 5524(2), are time-barred, since Andritz knew or reasonably should have known all information on which it bases its current claims more than two years prior to the filing of this action.

The claims asserted against Bridon subject to the two-year limitations period are Andritz' claims for: 1) negligence *per se* based on alleged violations of the PaCSL (Count VIII); and 2) strict liability (Count IX). Bridon is also entitled to judgment on both claims on independent grounds. (See the discussion infra.)

Andritz' claims for contribution under the PaUCTA, 42 Pa. Cons.Stat. Ann. § 8321 *et seq.* (Count X of the amended complaint); 2) for indemnification and contribution (Count XI); 3) for restitution (Count XII); and 4) for declaratory judgment (Count XIII) are either not subject to the two-year limitations period or are subject to a different accrual date and are, therefore, not part of this discussion.

### Accrual date

■■■ Under Pennsylvania law, the statute of limitations begins to run when the plaintiff has the right to institute and maintain a legal action; lack of knowledge, mistake or misunderstanding on his or her part do not toll the running of the statute. *Hayward v. Medical Center of Beaver County*, 530 Pa. 320, 608 A.2d 1040, 1042 (1992) and *Dombrowski v. Gould Electronics, Inc.*, 954 F.Supp. 1006 (M.D.Pa.1996). The party asserting a cause of action has a duty to use "all reasonable diligence to properly inform himself of the facts and circumstances upon which the right of recovery is based" and to bring an action within the limitations period. *Hayward*, 608 A.2d at 1042.

■■■ Andritz argues that the statute of limitations on its state tort claims was tolled by the discovery rule. The discovery rule is a judicially created exception to the general rule that a cause of action accrues when the wrongful conduct is committed. It tolls the

running of the statute of limitations until the party asserting the claim either knows or reasonably should know: 1) that he or she has suffered an injury; and 2) that the injury sustained was caused by the conduct of another party. *Id.* Tolling ceases when the plaintiff has "sufficient critical facts" to place him on notice that a wrong has been committed against him and that prudence dictates further investigation into the matter. *Pearce v. Salvation Army,* 449 Pa.Super. 654, 674 A.2d 1123, 1125 (1996). Plaintiff bears the burden of showing that it exercised "reasonable diligence."

██ "Reasonable diligence" was defined by the Pennsylvania Supreme Court in *Baumgart v. Keene Building Products Corp.,* 542 Pa. 194, 666 A.2d 238 (1995) as:

> . . . a reasonable effort to discover the cause of an injury under the facts and circumstance[s] present in the case. Long ago we recognized that '[t]here are few **facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful.** This is what is meant by reasonable diligence.'

*Id.,* quoting *Deemer v. Weaver,* 324 Pa. 85, 187 A. 215, 217 (1936). The question is whether the plaintiff "exhibited 'those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others.'" *Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 505 A.2d 973, 988 (1985). Although the standard itself is objective, each plaintiff is required to employ the level of diligence a reasonable person would employ under the same set of facts and circumstances. *Cochran v. GAF Corp.,* 542 Pa. 210, 666 A.2d 245, 249 (1995).

Whether the plaintiff exercised the requisite level of diligence is generally a question of fact, and therefore, an issue for the jury. Like any other question of fact, however, if there is no evidence which could reasonably support a finding that the plaintiff acted with reasonable diligence, judgment in favor of the defendant is appropriate. *Id.* 666 A.2d at 248.

**Andritz' investigation of possible claims for contamination at Plant No. 2 sought to be redressed by SVE system**

This part of the discussion centers on what information, if any, Andritz had to suspect contamination in the vicinity of Buildings 200, 201 and 205 in the vicinity of the area where the two 500–gallon UST's were formerly located (hereafter referred to as the former UST area). Alleged leaking from those UST's and*or from spills associated with re-filling those tanks is the only supportable theory for the origins of the ETX contamination, which the SVE system was designed to eliminate.

The chemical compounds found in the vicinity of the former UST area were identified by Andritz' environmental consultants as: ethyl benzene, toluene, and xylene (ETX compounds.). These are the compounds typically found in gasoline and other petroleum products and most typically associated with the breakdown of such products.

The first recorded discovery by Andritz of environmental contamination at any location at the Muncy site plant was in 1989 when a PaDEP inspection revealed suspected contamination. That discovery prompted Andritz to hire Compliance Services (Compliance) to perform an environmental compliance audit of Plant Nos. 1 and 2. The audit found further signs of contamination and concluded with a recommendation that a plan of action be devised and implemented. Among the areas of concern identified by the audit was the 500–gallon UST removed by Andritz in 1989. That tank was mentioned as a possible, but at that juncture, unconfirmable, source of contamination. The report noted the 1989 removal of the tank and offered the following observations on the information available and state of affairs:

> . . . The excavation was refilled and re-paved. There is no information on the integrity of the tank or the presence of any leaks. No visible leaks were noted on the tank itself which is stored on a nearby scrap pile, clean and disposed. The effect on groundwater has not been determined. This was scheduled for cleaning and disposal in December, 1989.

1989 Compliance Services Audit at p. 33. There was also some surface staining noted between Buildings 201 and 205, in the vicinity of the former UST area. Bridon was also identified in the report as a former owner which had operated a wire rope manufacturing operation at the site.

A second environmental audit was conducted in August, 1990 by ENSR Consulting & Engineering. The report noted minor staining of gravel in the vicinity of fill pipes for the two UST's. Bridon was again mentioned as a former owner which had conducted manufacturing operations at Plant No. 2.

Still more studies of the site were done in October, 1990. This time, the work was done by Environmental and Safety Design, Inc. (ENSAFE). The report generated by ENSAFE contained more in-depth findings about the presence of ethylbenzene, xylene and toluene (ETX) at a depth of 13.5 to 15.5 feet beneath the soil surface in the vicinity of the former UST area. ENSAFE reported its findings as "confirmation of major soil contamination in this area." Soil samples taken closer to the surface did not reveal the presence of contaminants.

ENSAFE's report plainly put Andritz on notice that contaminants were present at a level 13 to 15 feet beneath the surface in the area where the UST's were formerly located. The fact that the chemicals noted are consistent with the presence of gasoline or petroleum products and the fact that contamination was not present or detectable at or just beneath the soil surface served only to add to the suspicion that there could have been leakage associated with the UST's. Andritz now alleges that there is a clear link between Bridon and the presence of petroleum derivatives and other contaminants which required implementation of the SVE system. That alleged link would or should have been equally obvious to Andritz by the late fall of 1990.

The history of ownership and prior uses of the site, and specifically of Plant No. 2 and the former UST area, appear to have been well documented.

| Plant No. 2 was owned by: | From: |
| --- | --- |
| Jones & Laughlin Steel Co. | 1938 to Jan. 1975 |
| Bridon–American Corp. Jan. 1975 to Jan. 1979 | |
| Koppers Co.*Beazer East | Jan 1979 to Aug. 4, 1986 |
| Andritz Sprout Bauer, Inc. and its predecessors, SWM Corp., Sprout Bauer, Inc. and ABB Sprout–Bauer, Inc. | Aug. 4, 1986—Present |

Andritz knew at that time, or certainly could have readily ascertained, that ten to fifteen years earlier Bridon used the tanks to store naphtha, gasoline and possibly kerosene. This information was, apparently, readily ascertained by Andritz at some later date without considerable effort.

The other 500–gallon UST, sometimes referred to as the naphtha tank, was removed by Beazer in April, 1986. There is evidence, in the form of a contemporaneous memorandum written by Jeffrey Bower, a former Beazer employee, who is now employed by Andritz, that the tank was in good condition and showed no apparent signs of leaks.

Bower later testified at a deposition given in connection with this action that he observed holes in the naphtha tank, opening up the possibility that its contents could have leaked into subsurface soils.

The second 500–gallon UST was removed in 1989 by Andritz. During the removal operation, Andritz certainly had access to relevant information about the condition of the tanks and may have been able to ascertain from remnants in the tank their former use.

Although there are other UST's at the site, as documented in the 1989 Compliance Ser-

vices Audit, there are no others which have been identified as possible sources for the ETX contamination that Andritz sought to redress by implementing the SVE system.

Again, all of this was known to Andritz in November, 1990, when it received EN-SAFE's report on the October, 1990 sampling data. The only justifications Andritz puts forward for its five-year delay in filing this action are: 1) a right to invoke the discovery rule because the contamination was sub-surface and its extent and the remedy required to contain it were not immediately obvious; and 2) a right to invoke the continuing tort doctrine.

■ Neither entitles Andritz to a five-year tolling period of the statute. As we discussed above, the discovery rule tolls the statute only until such time as the plaintiff knows or through the exercise of diligence should know that he has a claim. Any tolling Andritz was entitled to claim under the discovery rule expired in November, 1990, at the latest, when it received ENSAFE's report.

■ The continuing tort doctrine does not extend the statute of limitations on negligence claims or the other tort claims Andritz invokes. It applies, as Judge Conaboy explained in *Dombrowski,* to trespass and nuisance claims. Andritz does not assert a trespass or a nuisance claim against Bridon; thus, the concept does not apply.

■ Nor can the delay be excused by possible delays or difficulties in identifying or tracking down potentially responsible parties. Plant No. 2 has had only four corporate owner*operators in the past quarter century: Andritz, Beazer, Bridon, and J & L. J & L was out of the picture, or deemed so, after it merged to form LTV and later filed bankruptcy, leaving only Bridon and Beazer, the two parties eventually sued, as potentially responsible parties.

Judgment will, therefore, be entered in favor of Bridon and against Andritz on the negligence *per se* claim asserted in Count VIII and on the strict liability claim asserted in Count IX on the grounds that both are time-barred.

**Strict liability claim**

Andritz asserts a claim for strict liability in Count VII based on the storage of gasoline, naphtha and kerosene in underground tanks and argues that that qualifies as an abnormally dangerous or ultra-hazardous activity, entitling it to invoke strict liability principles. Bridon argues that there is no cause of action in strict liability under the facts presented here.

The requirements for establishing a claim of strict liability are set forth in section 519 of the *Restatement (Second) of Torts.* See, e.g., *Cross Oil Co. v. Phillips Petroleum Co.,* 944 F.Supp. 787, 789 (E.D.Mo.1996). Section 519 provides:

> **General Principle** (1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
>
> (2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Id.

Section 520 defines the parameters for determining whether an activity is abnormally dangerous. It provides:

> In determining whether an activity is abnormally dangerous, the following factors are to be considered:
>
> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
> (b) likelihood that the harm that results from it will be great;
>
> (c) inability to eliminate the risk by the exercise of reasonable care;
>
> (d) extent to which the activity is not a matter of common usage;
>
> (e) inappropriateness of the activity to the place where it is carried on; and
>
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Restatement (Second) of Torts,* §§ 519 and 520 (1976).

418

■ There is little question that the use and storage of hazardous substances and related waste and byproducts, as alleged by Andritz can constitute an abnormally dangerous activity for section 520 purposes.

■ Such claims cannot, however, be asserted against a predecessor in title, because no duty is owed to a successor in title to refrain from acts which may result in contamination which will have to be dealt with by that individual or entity.

This issue has not come directly before the Pennsylvania appellate courts. Although the Pennsylvania Superior Court dismissed a claim of strict liability in *Smith v. Weaver*, 665 A.2d at 1222, the basis for the dismissal was a determination that operation of a gasoline station is not a hazardous activity. Although the action was brought by the current owner against a predecessor-in-title, the court did not cite that as a basis for dismissal of the claim or address the issue of whether such claims are viable.

Nor was the issue addressed in *Centolanza*. There, the plaintiffs asserted, but subsequently withdrew, a claim for strict liability. *Centolanza II*, 658 A.2d at 338.

Other jurisdictions have ruled such claims viable. That was the holding of the Supreme Court of New Jersey in *T & E Industries, Inc. v. Safety Light Corporation*, 123 N.J. 371, 587 A.2d 1249, 1259 (1991). The court held that the current owner can assert a cause of action in strict liability for abnormally dangerous activities against a predecessor in title who allegedly disposed of radium on the premises. The court focused on the dangers posed by defendants' alleged conduct and on the inappropriateness of the activity, concluding that those who, to gain some advantage or benefit for themselves, introduce or create an extraordinary risk of harm to the community should, as a matter of policy, bear the risk their acts create to those who acquire title after them. Id. 587 A.2d at 1257. These considerations, the court con-

cluded, warrant extending strict liability to successors in title who suffer or are required to redress the consequences of harm caused by the activities of prior owners. See also: *Prospect Industries Corp. v. Singer Co.*, 238 N.J.Super. 394, 569 A.2d 908, 911 (1989).[10]

That was also the holding of the United States District Court for the District of Maine in *Hanlin Group v. Intern. Minerals & Chemical Corp.*, 759 F.Supp. 925 (D.Me. 1990). The district court held that a strict liability claim could be asserted against a prior owner who had disposed of mercury and carbon tetrachloride on the property.

The Maryland Court of Appeals reached the opposite conclusion in *Rosenblatt v. Exxon Company*, 335 Md. 58, 642 A.2d 180 (1994). There, a claim in strict liability was asserted by the current tenant of commercial property against a former tenant and the operators of a gasoline station for harm caused by an alleged leak in the gasoline storage tanks. Among other reasons, the court found extending strict liability under the facts alleged would be inconsistent with the *Restatement of Torts (Second)*, § 519. *Id.* 642 A.2d at 188.

In *Rosenblatt*, the court looked to the justification for the application of strict liability, one of which is to insulate from harm neighboring landowners who have no other means of redress against neighboring landowners who harm their property by conducting abnormally dangerous activities on their own properties. The same justification does not apply when the party alleging harm is a subsequent owner. Such parties have, the court held, the ability to insulate themselves from harm by carefully and thoroughly inspecting the property and seeking full disclosures about prior activities on the site before agreeing to purchase the land. The court found it unreasonable to hold prior owners liable to remote purchasers who fail adequately to inspect the property or research

10. In both cases, the New Jersey courts rejected the contention that by agreeing to purchase the property "as is," the purchasers waived any right to bring a strict liability claim, since there was no evidence that the purchasers were aware of the contamination when they agreed to purchase

the premises. A party ignorant of the presence of an abnormally dangerous condition could not reasonably be held to have assumed the risk, the courts held. *T & E Industries*, 587 A.2d at 1259 and *Prospect Industries Corp.*, 569 A.2d at 912.

its history before agreeing to make the purchase.

In *Jones,* 945 F.Supp. at 1050–52, the United States District Court for the District of Texas rejected application of strict liability in this context for two reasons. The court found that: 1) the Texas courts have repudiated the strict liability principles set forth in *Restatement of Torts (Second),* §§ 519 and 520; and 2) the application of strict liability against prior land owners is inconsistent with the principles set forth in sections 519 and 520. *Id.*

Following the lead of the Maryland Court of Appeals in *Rosenblatt* and of other state and federal courts, the district court stated in *Jones:*

> Even if Texas law recognized the doctrine of abnormally dangerous activities as a basis for strict liability, the plaintiffs' claims do not fall within the parameters of section 519 of the *Restatement.* Section 519 imposes liability on one engaging in an abnormally dangerous activity "for harm to the person, land, or chattels of another." (emphasis added). See *Wellesley Hills Realty Trust,* 747 F.Supp. at 102 ... [Other citation omitted.] ... The doctrine applies, therefore, to claims by an occupier of land harmed by an activity abnormally dangerous in relation to the area, which is carried on by a contemporaneous occupier of neighboring land. *Rosenblatt,* 642 A.2d at 186. **The plaintiffs' claims call for an expansion of this doctrine to claims by subsequent occupants of the land on which the activity took place. See *id.* If Texaco's disposal of oil sediment and other wastes in earthen pits on the land constituted an abnormally dangerous activity, it engaged in the offensive activity at the time it owned the property. Thus, if Texaco caused harm to the property, it was to land it owned, not to the "land of another." Such activity falls outside the scope of § 519.** See *Wellesley Hills Realty Trust,* 747 F.Supp. at 102; *Rosenblatt,* 642 A.2d at 188; ... [Other citation omitted.] ...As the court explained in *Wellesley Hills Realty Trust:*
>
> > At the time Mobil operated the gas station and releases of oil inflicted harm to the property, Mobil owned the property. Thus, Mobil's operation of the gas station caused harm to property *of its own,* not property of *another.* The site became property of WHRT only after the contamination, the harm, had occurred. No matter how viewed, therefore, Mobil can not be accused of having caused harm to the property of another because of release of oil on its own property resulting from its operation of a gas station.
>
> 747 F.Supp. at 102 (emphasis in original). The court concluded, "It would be nonsensical to even formulate a rule that an actor is strictly liable for harm inflicted on his or her own property or person." Id. Similarly, in Rosenblatt, the court determined that it would be illogical to interpret the language of s 519 to hold the actor strictly liable for harm to the actor's own property in those cases in which, at some time thereafter, the property changed hands. 642 A.2d at 188. Furthermore, imposing strict liability on Texaco for the plaintiffs' losses, like imposing a duty of care in negligence, would violate the rule of caveat emptor in real estate transactions. ...

*Jones,* 945 F.Supp. at 1051 (Underlined emphasis original, bold emphasis added.) Compare: *Smith Land & Improvement Corporation v. Celotex,* 851 F.2d 86, 90 (3d Cir.1988) ("[U]nder CERCLA, the doctrine of caveat emptor is not a defense to liability for contribution but may only be considered in mitigation of amount due.")

That was also the holding of the District Court for the Eastern District of Missouri in *Cross Oil,* 944 F.Supp. at 790. Basing its holding on a prior unpublished decision, *Local No. 682 Health and Welfare Trust Fund v. Whiting,* No. 91–1575–C–7 (E.D.Mo. May 19, 1992), the court looked to the language of section 519 and case law origins of strict liability. Quoting from *Local No. 682,* the court stated in *Cross Oil:*

> [The section 519(1) doctrine of liability for abnormally dangerous activity] ...was originally set forth in *Rylands v. Fletcher,* L.R. 1 Ex. 265 (1866). *Rylands* held that if a person brings something on his land which, if it escapes, is likely to do harm,

that person is *prima facie* liable for all the damage naturally occurring if there is an escape. *Id.* at 279.

*Cross Oil,* 944 F.Supp. at 790. In rejecting the application of strict liability, the court was influenced by Missouri's narrow construction of strict liability and to the decision of the United States District Court for the District of Massachusetts in *Wellesley Hills Realty Trust v. Mobil Oil Corp.,* 747 F.Supp. 93 (D.Mass.1990).

In *Wellesley,* the court refused to extend liability for abnormally dangerous activities to subsequent owners, finding such liability inconsistent with the focus in Section 519 and in *Rylands* on harm to the property of another. The court found that it would be "nonsensical to even formulate a rule that an actor is strictly liable for harm inflicted on his or her own property or person." *Wellesley,* 747 F.Supp. at 102. See also: *325–343 E. 56th Street Corp. v. Mobil Oil Corp.,* 906 F.Supp. 669, 677–78 (D.D.C. 1995); *55 Motor Ave. Co. v. Liberty Indus. Finishing Corp.,* 885 F.Supp. 410, 423 (E.D.N.Y.1994); *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.,* 640 A.2d 950, 955 (R.I.1994); and *Futura Realty v. Lone Star Bldg. Centers,* 578 So.2d 363 (Fla.App. 3 Dist.1991), *review denied,* 591 So.2d 181 (Fla.1991).

Of the jurisdictions reviewed, New Jersey appears to be unique in recognizing a cause of action in strict liability assertable by subsequent owners. Its willingness to expand section 519 liability to include such claims is grounded in social policy. The New Jersey courts determined that the party who conducts an abnormally dangerous activity on his land, not his successor-in-title, should bear the risk of harm that activity causes.

However, the courts rejecting application of the doctrine looked to the language of section 519 and to its origins in English common law. That analysis is, we are persuaded, the proper one. It is plain from the language of section 519 that its scope was not intended to extend to successors-in-title. On that basis, we decline to extend it to the claims asserted here.

We will, therefore, enter judgment in favor of Bridon and against Andritz on Count IX.

### Count X

Count X asserts a claim for contribution under the Pennsylvania Uniform Contribution Among Tort-feasors Act (PaUCTA), 42 Pa. Cons.Stat. Ann. §§ 8321–8327. Bridon asserts that no such right of recovery exists, because no underlying tort or state law claims upon which such a claim can be based remain in the case.

Under section 8322 of the PaUCTA, liability attaches if two or more persons become "jointly and severally liable in tort for the same injury to persons or property." 42 Pa. Cons.Stat. Ann. § 8322.

Under our ruling, judgment will be entered in favor of Bridon and against Andritz on the claims of negligence *per se* and strict liability. No other common law tort claims remain in the case. See, e.g. *City of North Miami v. Berger,* 828 F.Supp. 401, 414 (E.D.Va.1993) ("no underlying tort or other cognizable state law claim... [was] asserted so as to give rise to a claim for contribution under state law."). Thus, there is no longer any possible theory of recovery which would entitle Andritz to invoke the PaUCTA as a source of recovery of SVE system costs. See generally: *Mattia v. Sears, Roebuck & Co.,* 366 Pa.Super. 504, 531 A.2d 789, 791 (1987) (Obligation of contribution exists · where, among other things, "the parties are each liable in tort to the plaintiff").

Judgment will, therefore, be entered in favor of Bridon and against Andritz on Count X to the extent that it asserts a claim for SVE system costs.

### Claims for contribution and indemnity asserted in Count XI

In Count XI Andritz asserts a claim for indemnification against Bridon. "Under Pennsylvania law, the right to indemnity 'enures to a person who, without active fault on his own part, has been compelled, by reason of some legal obligation to pay damages occasioned by the negligence of another.'" *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 316 (3d Cir.1985).

Bridon challenges Andritz' right to pursue a claim for indemnity for the SVE

system costs on two grounds. Bridon asserts that Andritz has no right of recovery, since it has not paid damages to a third party. That is certainly true. Andritz has itself incurred costs associated with design and implementation of the SVE system, but it has not, to date, had judgment entered against it or been compelled to pay money over to a third party based on a finding of liability entered against it. We, therefore, find that it has no right to invoke a claim of indemnification against Bridon. See, e.g., *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 122 (3d Cir.1992), *cert. denied,* 507 U.S. 1005, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993); *Girard v. Allis Chalmers Corp.*, 787 F.Supp. 482, 489 (W.D.Pa.1992); and *McClure v. Deerland Corp.*, 401 Pa.Super. 226, 585 A.2d 19, 22 (1991).

### Claim for restitution asserted in Count XII.

In Count XII, Andritz seeks restitution, alleging that Bridon had a legal obligation to clean up the Muncy site, or reimburse Andritz for its cleanup costs, and that, because Andritz performed the legal obligation of Bridon, the latter has been unduly enriched, requiring restitution to Andritz.

The sparse precedent on this issue favors Bridon. *See Smith Land & Improvement Corp. v. Rapid–American Corp.*, 1987 WL 56461 (M.D.Pa. Sept.21, 1987), *vacated and remanded on other grounds, sub nom. Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989).

 More importantly, this theory of recovery rests on the premise that Bridon is otherwise legally obligated to clean up the site or reimburse Andritz for the cleanup, a matter not yet fully determined, but at least resolved by this memorandum in favor of Bridon as to any obligation to pay costs associated with the design and implementation of the SVE system.

Therefore, Andritz' claim for restitution would appear to fall squarely within the preclusive scope of Section 106, Restatement of Restitution (1937):

> A person who, incidentally to the performance of his own duty or to the protection or the improvement of his own things, has conferred a benefit upon another, is not thereby entitled to contribution.

Andritz has not provided any authority in support of its restitution claim, and the court is aware of none.

Therefore, judgment will be entered in favor of Bridon and against Andritz on Count XII, to the extent it asserts a claim for SVE system costs.

### III. *Bridon's motion for summary judgment as to Plant 1 and offsite contamination.*

Defendant Bridon filed a motion for a judgment declaring it not liable for costs incurred by Andritz in connection with the cleanup of contamination found offsite and associated solely with Plant No 1.

Bridon moves for a ruling that it bears no liability for costs incurred by Andritz in investigating or eliminating contamination found outside the boundaries of Plant No. 2 or emanating from Plant No. 1, a facility Bridon never owned or operated.

For the reasons which follow, the motion will be granted to the extent of the relief provided in the accompanying order.

### Lack of evidence linking Plant No. 2 to Offsite Contamination

Bridon bases its motion on, among other things,[11] the geographic layout of the facility, and the lack of evidence that any contamination which originated at Plant No. 2 migrated offsite. Bridon points out that the Muncy site is not one homogenous entity. It consists of two distinct parcels, Plant No. 1 and Plant No. 2, which were owned separately until Beazer acquired Plant No. 2 from Bridon in 1979. Until that acquisition, the plants also operated under separate management, such that it cannot validly be assumed

---

11. We have already ruled on Andritz' asserted right to pursue an action under CERCLA section 107. As stated previously, Andritz cannot assert a claim under CERCLA section 107, but is relegated to a contribution claim under CERCLA section 113, 42 U.S.C. §§ 9607 and 9613.

that operations conducted at one were necessarily conducted at the other or that materials, chemicals or other substances used at one plant were necessarily likewise used or stored at the other plant.

In addition to disclaiming liability for any contamination resulting from operations at Plant No. 1, Bridon disclaims liability for what has been referred to as "offsite contamination." Offsite contamination has been found principally in the area adjacent to Plant No. 1 which lies west and north of that plant. This is not an area over which Bridon ever exercised ownership or control, and, Bridon contends, there is no physical evidence or expert opinion which would support a finding that contamination found in the offsite area could have migrated from Plant No. 2.

Chlorinated volatile organic chemicals (VOC's) have been detected in the offsite area. Although low levels of chlorinated VOC's have been detected at Plant No. 2 in monitoring wells 10, 11, 12 and 47, that by itself is not evidence that the VOC's found in the offsite area migrated from Plant No. 2. The direction of groundwater flow from Plant No. 2 is away from the offsite area. In addition, two monitoring wells, (nos. 46 and 47) which are located down gradient of monitoring wells 10, 11, 12 and 47 show no detectable levels of chlorinated VOC's. Monitoring wells 46 and 47 are located between the Plant No. 2 monitoring wells where chlorinated VOC's were detected and the offsite wells. Thus, the physical evidence does not support a theory that chlorinated VOC's migrated offsite through groundwater.

Nor have Andritz' experts opined that to be the case. When questioned on the subject, Andritz' expert Dan Raviv could not state that the chlorinated VOC's detected offsite emanated or even most likely emanated from Plant No. 2. What he stated was: that he did not think that he had ever stated that "this contamination, the offsite—west of Building 70 came from Plant 2..." Raviv deposition dated December 16, 1996 at pp. 160–62

All that Andritz offers in the way of support for its claim for offsite cleanup costs is speculation that contamination emanating from Plant No. 2 to which Bridon can be linked could have migrated as far as the offsite area. Andritz asserts, *inter alia*, that contaminated groundwater "may have" commingled with contaminated groundwater from the offsite area, and a groundwater plume from Plant No. 2 "likely" migrated so as to be a "potential" cause of contamination in the offsite area, etc. See: record document no. 244, n. 13. Speculation is not sufficient to fend off a motion for summary judgment. There must be more than mere suspicion or speculation to support findings by a jury.

 Andritz has not come forward with any evidence that raises a genuine issue of material fact on the issue of migration of contamination from Plant No. 2 to the offsite area. Bridon is, therefore, entitled to judgment in its favor on Andritz' claim for costs associated with offsite contamination.

\* \* \* \* \* \*

An order will be entered consistent with this memorandum.

### ORDER

For the reasons stated in the accompanying memorandum,

**IT IS ORDERED THAT:**

1. Andritz Sprout-Bauer, Inc.'s (Andritz) motion for partial summary judgment (record document no. 137) is denied in all respects.

2. The motion for partial summary judgment filed by Bridon-American Corp. (Bridon) (record document no. 141) seeking judgment that Bridon is not liable for soil vapor extraction remedy costs incurred at Plant No. 2 is granted.

3. The motion filed by Bridon (record document no. 145) seeking summary judgment on Counts III and VII of the second amended complaint is granted. (The reasoning forming the basis for the granting of this motion is set forth at pages 42 to 45 of the accompanying memorandum, as part of the discussion regarding Bridon's previous motion—record document no. 141.)

4. The motion for summary judgment filed by Bridon (record document no. 143) seeking a judgment that Bridon is not liable for costs incurred by Andritz for contamination associated with Plant 1 and the offsite area is granted.

5. Final judgment in favor of Bridon under paragraphs 2, 3 and 4 of this order will be deferred until the conclusion of the entire case.